517 So.2d 700 (1987)
LOCATION 100, INC., Appellant,
v.
GOULD S.E.L. COMPUTER SYSTEMS, INC., a Florida Corporation, and Evin R. Welch & Co., Inc., a Florida Corporation, Appellees.
Nos. 4-86-0594, 4-86-1732 and 4-86-1733.
District Court of Appeal of Florida, Fourth District.
December 2, 1987.
Rehearing and Rehearing Denied January 26, 1988.
*701 Steven R. Berger and Donna Weston of Steven R. Berger, P.A., Miami, and Stuart L. Stein, P.A., Fort Lauderdale, for appellant.
Ellen B. Pilelsky, Jon W. Zeder and Evan K. Kaplan of Thomson Zeder Bohrer Werth & Razook, Miami, for appellee-Gould S.E.L. Computer Systems, Inc.
John P. Kelly of Fleming, O'Bryan & Fleming, Fort Lauderdale, for appellee-Evin R. Welch & Co., Inc.
Rehearing and Rehearing En Banc Denied January 26, 1988.
GLICKSTEIN, Judge.
This is an appeal by plaintiff of (a) a final judgment and decree of the Broward County Circuit Court denying specific performance, and (b) orders granting defendants attorney's fees and costs. We affirm the former, reverse the later and remand, discussing those issues we deem should be discussed.

I

THE ISSUE OF "PUBLIC ROADS"
Gould S.E.L. Computer Systems, Inc., the seller, instituted the present action in October 1982 to recover as liquidated damages the earnest money deposit Location 100, Inc., the buyer, had made in connection with a sale/purchase agreement dated August 5, 1982. Gould had formally tendered closing documents at a scheduled closing but Location had failed to close the purchase. The broker, Evin R. Welch & Co., Inc., was also a defendant, being the stakeholder.
*702 Location filed an answer and counterclaim, alleging Gould was in breach of a contract covenant concerning ingress to and egress from the subject property on public roads, and asking for specific performance or, alternatively, rescission and return of the earnest money, as well as charging Gould, acting through the broker, with fraudulently misrepresenting that the property was ideal for an industrial park and that there was ingress and egress via public roads, namely Hiatus Road. Location sought both compensatory and punitive damages. A similar fraud charge against Welch was subsequently added.
After various delays, mostly because of Location motions to continue, the trial finally took place in February, 1986. The breach of contract and fraud claims were tried to a jury, while the court received evidence relevant to the Location specific performance claim.
During the trial the court, over objection, took judicial notice of the statutory definition of the word "road" set forth in the Florida Transportation Code at section 334.03(1), Florida Statutes (1981). The court also instructed the jury by giving the same definition. At the jury charge conference, Location's attorney objected to including in the instructions the statutory definition of "road," stating it would mislead the jury by unfairly emphasizing one piece of evidence over another. Just preceding the instruction the court said that in determining Location's claim that it refused to close because Gould failed to provide ingress and egress to the property over public roads, the jury should consider the definitions of "road," "street" and "right of way," that the court was going to give them. Location had requested the statutory definitions of "street" and "right of way."
During its deliberations the jury sent the court a note requesting the statutory definition of public road. The court consulted counsel for the parties. Location's counsel suggested repeating "the charge on that." Location's co-counsel indicated the court should say there is no statutory definition of "public road" and then repeat the definitions of "road" and "street" given in the instructions. What the court did was to tell the jury it had read them no definition of public road; it had read them a definition for road, street, and right-of-way, and would reread those  which it did.
The jury found in favor of Gould and against Location on all counts addressed to it. The court announced it was accepting the jury's findings of fact, and said it would deny Location's counterclaim for specific performance. The written order, entered March 3, 1986, reflected the above statements, and included the finding that Location had not been ready, willing and able to purchase the property.
Gould had purchased the subject property in 1979. The land was unimproved acreage in Tamarac. A thirty foot platted right of way, which had been dedicated and accepted, connected with McNab Road and afforded ingress and egress; but there was no improved road to the property. A survey obtained by Gould before it bought the property referenced the right of way. There was a gravel road over a Florida Power & Light Company easement that could be used for physical access at the present time. The right of way mentioned earlier abutted the property on its eastern boundary. The Gould person who acted for the company in buying and later attempting to sell the property, David Galloway, was aware it would be necessary to meet county and city requirements if an improved road was constructed on the right of way.
Gould had originally purchased the property for its own potential use, but decided to set up operations elsewhere and instructed Galloway to sell the parcel. Galloway had an aerial photograph made, obtained an appraisal, and gave both to Welch, a real property broker who was familiar with the property. Welch obtained an exclusive listing agreement for sale of the property.
Welch prepared a brochure on the property and advertised it for sale. George May, of Location, called Mr. Welch, the principal of the brokerage firm, in response to one of the advertisements, and was sent a brochure. There were several telephone *703 conversations between the two. The brochure about the property referred to availability of a survey showing road, drainage and FP & L easements, and Mr. Welch testified he made it clear there was only a thirty foot right of way for a road and no improved roads on the property.
May testified he determined from the brochure that the property could be zoned industrial, and that, according to the map on the last side, Hiatus Road ran in front of the property. [Arguably one could so conclude from that map, but there is not in fact any improved road along any boundary of the property.] According to May he called Welch and said he had an offer for the property. Negotiations ensued. May testified that Welch told him the property could be developed into an industrial park. May said he asked Welch whether "roads were available for developing the property into an industrial park, and he said yes." He said the road on the west side was in and it had 180-foot easement. May said he wrote in "180-foot easement, road in" on the west side of the map, on his copy of the brochure, during and as a result of the conversation, with Mr. Welch looking on. May said Welch also told him there was a dirt road on the east side that showed up on the City of Tamarac's maps. Later during this meeting at May's office Welch took May's offer with his $1,000 check and left. The offer was to purchase the property for $910,000.00, and contained a clause providing that closing would be "in 180 days with two 180-day extensions, if requested by buyer for the approval of zoning or building permits, or other permits." Welch then presented this offer to Gould. According to Galloway, Gould rejected Location's original offer, in part, at least, because the closing time period was unacceptable. As the next step in negotiations, Gould directed Welch to prepare a counteroffer which would contain no provision for platting or zoning; its terms were to include a purchase price of $15,500.00 per acre, requiring a $21,000.00 deposit, and a closing within 30 days. Gould signed this counteroffer and Welch presented an original and two copies of it to May. May accepted the counteroffer, making up additional checks totalling $20,000. He phoned to tell Welch he had a deal, and requested a survey to give to the architect who would plan the development of the property. This counteroffer became the sale-purchase agreement. The total purchase price was $987,350. The conveyance was to be subject to an existing first mortgage of $300,540, and the seller was to take back a three year second mortgage of $461,810. At closing the buyer was to pay $204,000. Welch said a copy of the 1979 survey was attached to the counteroffer; May denied receiving or seeing the survey prior to signing the contract. Closing was to take place on or before September 30, 1982, and there was no time-of-the-essence clause.
The survey shows a thirty-foot road right of way along the south line of the property and the 180-foot FP & L easement along the westernmost boundary (the property can best be described as consisting of a large rectangle plus a small rectangle to the west). There is no indication on the survey that improved roads exist on or next to the property.
The sale/purchase contract is on a standard form of the real estate industry. On the back are a series of stock paragraphs with the heading "Standards for Real Estate Transactions." Paragraphs Y and Z are as follows:
Y. SURVIVAL OF COVENANTS AND SPECIAL COVENANTS The covenants in this contract shall survive delivery of deed and possession. The Seller covenants and warrants (1) that there is ingress and egress to said property over public roads, and (2) that there are no parties in possession other than the seller.
Z. No agreements or representations, unless incorporated in this contract shall be binding upon any of the parties. Typewritten or handwritten provisions inserted in this form or attached hereto as addendums shall control all printed provisions in conflict therewith.
May said he signed the contract without ever inspecting the property.
*704 In a letter to Gould's counsel, Hilarion A. Martinez, dated September 7, 1982, Location's counsel, Joseph Mannino, specified the items on which additional information would be required. One item was the need to confirm that there was ingress and egress over public roads, as stated in Paragraph Y. The following constitute Martinez' efforts to satisfy the ingress-egress issue:
1. By phone call and letter of September 14, 1982, Martinez told Mannino ingress and egress to the property was afforded by a thirty-foot wide road right of way per plat reflected in the survey, a copy of which was enclosed with the letter.
2. By letter dated September 22, 1982, appellee's counsel reaffirmed the above.
3. Accompanying a letter dated September 28, 1982, and proposed closing documents, Martinez sent Mannino an affidavit of C. Shelton James, Gould's president stating there are no public roads between McNab Road and the property, and that ingress and egress were over the right of way.
4. In a letter dated September 30, 1982, Martinez said Gould intended to tender the documents the following day, and that these would include additional documentation affirming access.
5. With the closing documents tendered October 1, 1982, Martinez included letters from a surveyor confirming that the road right of way provided access and had not been vacated. The Gould president's affidavit tendered at this time did not contain the statement that there were no public roads from McNab Road to the property. At trial it was explained that to be accurate the statement would have been there were no improved public roads, and therefore the statement was omitted.
A letter dated September 29, 1982, from Frederic C. Buresh, of Mannino's office, stated the buyer would not be prepared to close on September 30, 1982, or a future date until the issue of ingress and egress was resolved. Buresh said in the letter that the copy of the plat contained in the abstract did not set forth "right-of-way easements in the subject property," and that the easement as set forth in the deed did not extend around the full length of the east boundary of the property and thus it was not clear "whether the easement connects to a public land". ["Land" probably was intended to be "road."] Buresh wanted to know whether the easement was continuous and sufficiently wide to meet city and county requirements to develop the property without obtaining additional easements from adjoining property owners.
Martinez responded on September 30, 1982. In his letter he stated his letters of September 14 and September 22 had cleared up this asserted defect; the assertion was not grounds for delay of the closing, that the seller demands that the closing take place as called for in the contract. He said further documentation to confirm access would be delivered the next day, and closing was to take place immediately thereafter unless the parties agreed in writing to extend the closing date.
On October 1, 1982, Martinez appeared at the office of Location's attorney. The documents he brought included the revised James affidavit that no longer said explicitly that there are no public roads between McNab and the subject property.
According to Martinez' testimony, there were public roads providing access to the property, but there were not "improved" public roads. May testified he had the ability to close and would have closed had the access problem been resolved. He said Location had cash and first mortgage assets totalling about $200,000.
There was evidence that Location continued to try to solve the access problem after October 1, 1982. A letter from Buresh to Martinez dated October 5, 1982, reflected that according to the broker of the neighboring owners the owners of the adjoining property were probably willing to grant an additional easement if there were satisfactory time limits within which road improvement occurred and other requirements were met. However, Buresh said, it would first be necessary to have an engineer determine just how wide the right-of-way had to be. Buresh stated the existing easement *705 was thirty or forty feet, and the minimum required width was fifty feet. Paul Himmelreich, the neighboring owners' broker, testified that Buresh's letter of October 5, 1982, reflected conversations Buresh had with him. He said a right of way would have to be wider than the existing thirty foot easement to satisfy county requirement. He said Gould never contacted him respecting obtaining a wider right-of-way from the owners of the neighboring property.
Three days after the above letter was written  on October 8, 1982  Gould filed suit for the earnest money as liquidated damages.
A Tamarac city planner, a real estate appraiser, and the Broward County Assistant Director of Engineering Services all testified that industrial development would not be permitted where there was only a thirty foot right of way. The last of these also testified there were no traffic ways contiguous to the subject property.
It was appropriate for the trier of fact to be asked to determine whether the property met the covenant requirement. Although construction of a contract is ordinarily a matter of law for the court, e.g., Innkeepers International, Inc. v. McCoy Motels, Ltd., 324 So.2d 676 (Fla. 4th DCA 1975); Royal American Realty, Inc. v. Bank of Palm Beach & Trust Co., 215 So.2d 336 (Fla. 4th DCA 1968), where construction involves extrinsic facts interpretation of the contract may be put before a jury under proper instructions. See 11 Fla. Jur.2d Contracts § 102 (1979).
It is true as appellant says that the record reveals the contemplation by Location to develop the property for industrial use. The broker's brochure indicated the property was ideal for an industrial park. There was also evidence that access by a thirty-foot right of way is insufficient for governmental approval of conversion of a property to industrial use. But these surrounding circumstances do not objectively tell us whether the existence of the right of way satisfies the Paragraph Y requirement that there be "ingress and egress to said property over public roads."
There was, on the other hand, evidence that the recorded plat provided for the thirty foot right of way; that the contract proposal was accompanied by a copy of the survey showing the right of way (although there was contrary testimony also); and that by ordinance the platted right of way was accepted as dedicated.
The weighing of the evidence and of witness credibility are for the finder of fact, not for the reviewing court. The standard of review is at a low level  competent substantial evidence. The question resolves itself to whether existence of a dedicated right of way connecting the property to improved public roads satisfies the Paragraph Y covenant. Does the provision imply there must be in being an improved public road directly adjacent to the subject property, or is the right of way sufficient?
There was competent substantial evidence on the basis of which jury and judge could have concluded as they did. A platted right of way dedicated to the public and accepted by it, even though narrow, could constitute access to public roads within the meaning of Paragraph Y. The contract did not have to mean that an improved road had to abut the property. Moreover, jury and court could have found more credible Mr. Welch's testimony about his description to Mr. May of access to the property before any contract was executed, than Mr. May's testimony on the same subject. Mr. Buresh's September 29, 1982, letter may be construed to imply that if the right of way in fact connects with a public road, the Paragraph Y requirement is, in his opinion, met. Moreover, Mr. May's testimony may be read to say he knew there was no paved road when he signed the contract. In answer to a cross examination question, "You knew that there was no paved road on the property, didn't you?" May answered, "Not paved."
It cannot be said that the trial court prejudiced the outcome by reading to the jury the statutory definition of road, albeit that definition was created for a different context, namely that of the duties and *706 functions of the Florida Department of Transportation.

II

AWARD OF ATTORNEY'S FEES TO SELLER AND BROKER
Both the seller and the broker moved after trial for fees and costs. These claims were based upon the form contractual provision of fees to the prevailing party in any litigation arising out of the contract. We conclude this provision not to include the broker in this dispute.
Gould's expert said Gould's counsel was entitled to $250,000 for its representation of Gould. He was unable to separate the work in defense against the specific performance count from the fraud in the inducement defense. Counsel's records showed time expended but did not indicate what claim was being worked on at any given time. He thought it would be a reasonable practice for counsel moving for reasonable attorney's fees and costs to identify time sheets by claim worked on.
The order in favor of Gould held that recovery for fees incurred in defending against the fraud counterclaim was not precluded under the above cited contractual provision, and awarded Gould $250,949 for fees and costs. Gould's counsel had submitted an affidavit stating that no more than one-third of the time devoted to the representation went to the tort defense.
Appellant contends that the attorney's fees incurred by Gould in defending against Location's fraud counterclaim did not arise out of the contract and therefore are not to be awarded to the prevailing parties pursuant to the provision for award of attorney's fees of the land purchase agreement. We agree.
Florida cases hold that attorney's fees for fraud in the inducement may not be awarded under an attorney's fee clause in the resulting contract. See Dickson v. Dunn, 399 So.2d 447 (Fla. 5th DCA 1981), where the court quoted Chanin v. Chevrolet Motor Co., 89 F.2d 889, 891 (7th Cir.1937), to the effect that an action to recover for fraud in the inducement is based, not on the contract, but on the tort. Other cases, not nearly so apposite to the present case as Dickson, are Keys Lobster, Inc. v. Ocean Divers, Inc., 468 So.2d 360 (Fla. 3d DCA 1985), and Fairways Royale Association v. Hasan Realty Corporation, 428 So.2d 288 (Fla. 4th DCA 1983).
Here the trial court found that the "arising out of the contract" language did not preclude award of fees for the defense against Location's fraud claim. We conclude the trial court was incorrect, and reverse on the attorney's fee order pertaining to Gould and remand for the purpose of reducing the fee to eliminate the amount ascribed to the fraud defense. Whether further hearing is necessary we leave to the discretion of the trial court.
As to the attorney's fee award to Welch, we find no basis whatsoever to sustain any of its award. Accordingly we reverse same.
ANSTEAD, J., and SALMON, MICHAEL H., Associate Judge, concur.