751 So.2d 685 (2000)
Jack F. DURIE, Appellant,
v.
STATE of Florida, Appellee.
No. 5D99-265.
District Court of Appeal of Florida, Fifth District.
January 28, 2000.
Rehearing Denied March 13, 2000.
*686 Terrence E. Kehoe of Law Office of Terrence E. Kehoe, Orlando, for Appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Kristen L. Davenport, Assistant Attorney General, Daytona Beach, for Appellee.
HARRIS, J.
The Bar's ethics, or at least those ethics as interpreted by a significant number of lawyers, were put on trial in this case and the jury found them wanting.[1] The jury *687 determined that Durie's perceived obligation to his client to obtain the greatest recovery for his injuries does not legitimize the fraudulent manipulation of a settlement, or the misrepresentation of that settlement to Medicaid, in order to defeat Medicaid's legitimate claim for reimbursement of medical expenses. The jury convicted Durie of grand theft. These are the facts:
Kee and Solomon were at a topless bar when they got into an argument with Barber. When the bar closed, the argument continued outside in the bar's parking lot, where Barber stabbed Kee in his spinal cord and in the back of his head. Barber then dragged Kee to a nearby field where he continued his assault and left Kee for dead. Barber then attacked Solomon and stabbed him in the right forearm causing substantial and permanent injuries.
Kee's medical expenses were covered by Medicaid, which filed a lien in the amount of some $40,000 against any recovery that Kee might receive against a third party liable for his injury. Solomon's medical expenses were covered by private insurance and no claim for reimbursement was asserted.
Both Kee and Solomon retained Durie to represent them in their claim against the bar for damages. Medicaid advised Durie of its claim.[2] When it appeared that the only asset of the bar was a $100,000 insurance policy, Durie decided to settle for that amount.[3] Because of the Medicaid lien against Kee, Durie recommended to his clients that the settlement agreement be structured so that 99.5% of the proceeds "be in the name of" Solomon and that Medicaid be advised that Kee was to receive only $500. When asked whether his clients had agreed prior to settlement as to how the money would be actually divided, Durie responded:
No. I'll explain that ... I knew before I could, everything could be fine tuned and finalized because Mr. Solomon indicated a willingness to share part of a valid recovery. I had sent a notice to Medicaid, which I did, saying $500. That's my intention, not to do anything about making a further recommendation to Mr. Solomon as to what to do with a settlement until after that ... stage [getting Medicaid's acceptance] passed.
Hence, it is clear that when Durie represented to Medicaid that Kee would receive only $500 from the settlement, he was *688 aware that the "settlement" would not be made on the 99.5% / .5% basis. He deferred the formal agreement establishing the actual disbursement, and the disbursement itself, until after he had dealt with Medicaid in an effort to obtain its release based on his misleading representation. Durie apparently believed that by delaying the agreement for a greater allocation of the settlement to Kee, he could avoid his obligation under the law.[4]
Durie contends that he had no obligation to Medicaid either to reveal the fact that he also represented another client claiming against the common fund or that an adjustment to Kee's allocation would be forthcoming.[5] The jury rejected this notion of a lawyer's obligation.
Durie's position was that by settling in the manner that he did, Solomon became the "owner" of all but $500 of the settlement and hence any amount given to Kee in excess of that came from Solomon's generosity and not from a third-party liable for Kee's injuries. The contention that Durie actually believed that this strawman settlement which incorporated contracted generosity was an ethical and legal way of taking Medicaid's money and giving it to Kee, whom he considered a more deserving recipient,[6] has no support in the record. Such contention is inconsistent with his delaying an agreement so providing until after misleading Medicaid about his settlement. It is also inconsistent with the formal agreement subsequently entered into requiring an 80% / 20% split rather than an agreement limiting Kee to $500 plus what the open-ended generosity of Solomon might produce, and with the initial disbursement made by him to Kee in the form of a check in the amount of $5,000 in "advance of payment." This was ten times the amount Durie claims was then due Kee. The formal agreement acknowledged that the insurance company for the bar had paid $100,000 to settle with both Kee and Solomon and that plaintiffs could allocate the settlement as they might determine. The agreement also acknowledged the problem in settling created by the Medicaid lien in that there would be nothing left for Mr. Kee if he benefitted from the settlement. Therefore, the agreement provided that in order for the settlement to be properly "managed so as to obtain a recovery for anybody is to allow approximately 99% of the settlement to be made in the name of Mark Solomon. Our agreement is that Mr. Solomon would share his settlement proceeds on a five-to-one split or an eighty percent / twenty percent split, eighty percent to Mr. Kee, or his assigns, twenty percent to Mr. Solomon."[7] (Emphasis added).
Even with this agreement providing a settlement to Kee of some $80,000 and even though Durie knew of the legal assignment to Medicaid of $40,000 of Kee's share of the settlement, Durie disbursed all the funds (except costs and attorney's fees) to Kee. Durie justifies this on two bases. First, as indicated above, the settlement *689 money going to Kee did not come from a third-party but rather from Solomon's largess.[8] The jury did not accept this contention. Second, Durie urges that because he believed he had the obligation to his client to achieve the best result for him, and because he believed this settlement structure was a legal way of achieving this desired result,[9] even if he was wrong, his conduct did not constitute a criminal act. The trial judge did not consider this a legal defense to grand theft nor did the jury. Nor do we.
Finally, consistent with his claim of immunity based on good faith, Durie urges that the trial court erred in not giving his requested instruction that "[a]n attorney who acts in good faith in an honest belief that his advice and acts are well-founded and in the best interest of his client is not answerable for mere error of judgment or for a mistake in a point of law which has not been settled by the Court of last resort in his state and on which differences of opinion may be entertained by well-informed lawyers." He relies on Rodriguez v. State, 396 So.2d 798 (Fla. 3d DCA 1981). In Rodriguez, the defendant, the manager of a hotel, kept certain rental payments claiming he was entitled to them *690 pursuant to an agreement with the owner. The owner gave a different version of the arrangement, under which the manager was entitled to the rental payments. The court held that the jury should have been instructed: "Where it clearly appears that the taking of property was consistent with honest conduct, as where the taker honestly believes that he or she has a right to property, the taker cannot be convicted of theft, even though the taker may have been mistaken." (Emphasis added). We do not find Rodriguez to support the requested instruction. Here, there was no contention that Kee was entitled to the $40,000 assigned to Medicaid. Indeed, the purpose of the strawman charade was admittedly to avoid Medicaid's claim. See Thomas v. State, 584 So.2d 1022 (Fla. 1st DCA 1991). The fact that Durie devised a scheme that he believed could legally transfer Medicaid's money to Kee is not the same as believing that Kee was actually entitled to the money. A mistake in the requirements of law is not a defense to grand theft. Even if Durie believed he could evade Medicaid's lien by the use of dual agreements and contracted generosity, and even if a substantial number of the Bar agrees with him, his actions were not "consistent with honest conduct" and do not justify a jury instruction. The court did not err in refusing to give the requested instruction.
AFFIRMED.
PETERSON, J., concurs.
W. SHARP, J., concurs specially, with opinion.
W. SHARP, J., concurring specially.
The primary issue in this case, for me, is whether there was sufficient evidence adduced at trial to sustain the jury's determination that Durie was guilty of grand theft.[1] In the context of this case, the state had to prove Durie's intent to deprive Medicaid of funds it rightfully was entitled to, and that he did so, when he constructed a false statement (the 99.5% to.5% arrangement), on which Medicaid relied when it released its rights to the settlement funds. Section 409.910(17) provides:
Responsibility for payments on behalf of Medicaid-eligible persons when other parties are liable.-
(17) A recipient or his or her legal representative or any person representing, or acting as agent for, a recipient or the recipient's legal representative, who has notice ... or who has actual knowledge of the agency's rights to third-party benefits under this section, who receives any third-party benefit or proceeds therefrom for a covered illness or injury, is required either to pay the agency, within 60 days after receipt of settlement proceeds, the full amount of the third-party benefits, ... or to place the full amount of the third-party benefits in a trust account for the benefit of the agency pending judicial or administrative determination of the agency's right thereto. Proof that any such person... knowingly obtained possession or control of, or used, third-party benefits or proceeds and failed either to pay the agency the full amount required by this section, ... unless adequately explained, gives rise to an inference that such person knowingly failed to credit the state or its agent for payments received... and acted with the intent set forth in s. 812.014(1). (Emphasis supplied)
Section 812.014(1) provides:
A person commits theft if he or she knowingly obtains or uses, or endeavors to obtain or to use, the property of another with intent to, either temporarily or permanently:
(a) Deprive the other person of a right to the property or a benefit from the property.
(b) Appropriate the property to his or her own use or to the use of any person *691 not entitled to the use of the property. (Emphasis supplied)
Section 812.014(2)(b) provides:
If the property stolen is valued at $20,000 or more, but less than $100,000, the offender commits grand theft in the second degree, ...
Evidence tending to show that Durie devised a false settlement to divert funds from Medicaid to Kee were that: 1) the false settlement was never agreed to by Solomon or Kee, 2) it was simply a devise to get Medicaid to release its claims against Kee; 3) Durie disbursed funds to Kee far in excess of the false settlement amount as "an advance" on the actual settlement (an 80% to 20% split); and 4) Solomon never received any funds with which to "gift" Kee. Kee testified that from the beginning he thought he was always going to receive the larger amount of the funds (80%). Although there was evidence to the contrary, the jury chose not to believe Durie.
While an attorney must do the best job he can for his client, he cannot engage in dishonest or fraudulent conduct. Fla. R. Prof Conduct 4-8.4(c). See DeClaire v. Yohanan, 453 So.2d 375 (Fla.1984); Ocean Bank of Miami v. Inv-Uni Invest. Corp., 599 So.2d 694 (Fla. 3d DCA 1992). It is common practice for personal injury lawyers to try to minimize lien claims against their clients, as best they can. If a lawyer represents two clients who have claims against the same liability pot, as in this case, I cannot say it is unethical to maximize the recovery for the one who can benefit the most from the pot, particularly if the other client will receive nothing. That is, with the caveat that both clients are fully aware of the facts, dual representation, and agree to the arrangement, and it is an actual binding settlement.
However, where Durie stepped over the ethical and criminal line in this case was misrepresenting the actual settlement arrangement (80% to 20%) to Medicaid as being .5% to 99.5%. Had Durie disbursed the settlement to Kee and Solomon with no strings attached on the .5% to 99.5% basis, assuming it was the actual agreement, then if Solomon chose to gift Kee with some of the funds, that would be his property and his business. Unfortunately for Durie, that is not what the jury found happened in this case.
NOTES
[1] This should be of concern to The Florida Bar which is attempting to restore respect for the profession. Does "best interest of the client" as asserted herein, prompt some plaintiffs' lawyers to send malingering clients to be examined by charlatans knowing they will receive a favorable, if false, diagnosis, or some defense lawyers to require an IME from an "expert" whose opinion is based more on the pocketbook than on truth? When there were fewer lawyers, and thus less competition for the client base, even the highest professional standards were readily accepted by the practicing bar. As the number of lawyers continue to increase, and the potential client to lawyer ratio becomes smaller, high professional standards are seen by some to conflict with the lawyers' financial well being. Thus, "the best interest of the client," as so vividly pointed out by this case, has become a mantra justifying deception, misrepresentation of the facts, and the diversion of money belonging to one person or entity to another (theft). Perhaps the reason the public has less respect for lawyers is that it sees lawyers who are less respectable. If we look carefully at ourselves, will we, like Pogo, see the enemy? There was a time, some say in Camelot, when the lawyers themselves screened out fraudulent clients. A large majority of lawyers still do. Those that do not should receive a crash course in remedial ethics.
[2] See section 409.910(17), Fla. Stat:

Proof that any such person had notice or knowledge that the recipient had received medical assistance from Medicaid, and that third-party benefits or proceeds therefrom were in any way related to a covered illness or injury for which Medicaid had provided medical assistance, and that any such person knowingly obtained possession or control of, or used, third-party benefits or proceeds and failed either to pay the agency the full amount required by this section or to hold the full amount of third-party benefits or proceeds in trust pending judicial or administrative determination, unless adequately explained, gives rise to an inference that such person knowingly failed to credit the state or its agent for payments received from social security, insurance, or other sources, pursuant to s. 414.39(4)(b), and acted with the intent set forth in s. 812.014(1).
[3] Although Rule 4-1.7, Rules Regulating the Florida Bar, relating to conflicts of interest was not an issue before the jury, it was the first ethics consideration that faced Durie. When it appeared that there was only a $100,000 fund from which two injured persons, each of whose injuries may well exceed such fund, could reasonably look for recovery, their conflict became obvious. It is questionable whether a lawyer under these circumstances "can reasonably believe the representation will not adversely affect the lawyer's responsibilities to and relationship with the other client." Further, Kee's testimony indicates that this obvious conflict was not adequately explained to him. Had the clients been separately represented, it is doubtful this situation would have arisen.
[4] Section 409.910(1), Florida Statutes, provides: "It is the intent of the Legislature that... Medicaid be repaid in full and prior to any other person, program or entity. Medicaid is to be repaid in full from, and to the extent of, any third-party benefits, regardless of whether a recipient is made whole or other creditors paid."

Section 409.910(6)(b), Florida Statutes, provides that "[b]y applying for or accepting medical assistance, an applicant, recipient, or legal representative automatically assigns to the agency any right, title, and interest such person has to any third-party benefit, excluding any Medicare benefit to the extent required to be excluded by federal law."
[5] Rule 4-4.1, Rules Regulating the Florida Bar, relating to truthfulness in statements to others provides "In the course of representing a client a lawyer shall not knowingly: (a) make a false statement of material fact or law to a third person; or (b) fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by rule 4-1.6."
[6] Unfortunately for Durie, Florida does not recognize a Robin Hood defense.
[7] His math is no better than his solution to the Medicaid lien "problem."
[8] Durie contends that the evidence shows that the bar would not have been liable for Kee's injuries even had he gone to trial. Apparently this is because the bouncer was not present in the parking lot when Kee was attacked but was there, but rendered no assistance, when the assault on Solomon occurred. Liability is impossible to predict in absence of established facts; it seems clear, however, that the absence of the bouncer from the parking lot at the time of the attack would not prevent liability if the bar owner should have reasonably foreseen that patrons might be in danger in the parking lot. Stevens v. Jefferson, 436 So.2d 33 (Fla.1983), holds that a tavern owner's actual or constructive knowledge, based upon past experience, that there is a likelihood of disorderly conduct by third persons in general which may endanger the safety of his patrons is also sufficient to establish foreseeability. In this case, it is alleged that the argument between Kee and Solomon and Baker commenced in the bar and continued, after closing, in the parking lot. The jury may well have found that the bar was just as negligent for not having the bouncer accompany the patrons to the parking lot as in having a bouncer there who did not assist. In any event, however, we agree with the State that whether or not liability on the part of the bar could have been proved, this issue was mooted when the bar settled the claims of both Kee and Solomon for policy limits. This settlement constituted the "third-party benefits" under the statute. The trial court did not err in not requiring the State to prove that if a civil trial had been conducted Kee would have prevailed on the issue of liability.
[9] It is somewhat surprising, and extremely disappointing, that other members of the plaintiffs' Bar testified in support of Durie's position. One testified:

Well, if you have two claimants and they both have a claim against the same entity and one claim has some irreconcilable problem with ... some obligation to repay some entity that's paid some expense on its behalf ... [Using Medicaid claim as an example] you would certainly want to favor the client who could make a full recovery. And so you ... could settle the claim such that you made a full recovery for the client who ... is not in debt to Medicaid, or the lien from Medicaid ... and then settle the claims for the client who does not have a Medicaid relationship ... There's nothing you can do for one client, then you're going to try to do everything you can for the other. That's what you do.
We assume the witness is talking about a legitimate settlement and not a sham in which the settlement provides one thing but the parties agree to something entirely different. But it is troubling that the attorney is willing to forego a vigorous representation of one client, merely because a Medicaid lien is filed against him, and put all her efforts in obtaining a recovery in favor of the other. This seems to be a conflict of interest that lawyers should avoid at all costs, even if they have to forego a client.
This same witness supports Durie's conduct in withholding information from Medicaid by stating that the lien attaches only on the recovery by the one subject to the lien and that it is appropriate to get all the money for Solomon and then permit Solomon to "do whatever he wanted with the money." The witness opined that nothing in the statute requires Durie to disclose that Kee will receive money form Solomon. She does not discuss the impact of Rule 4-4.1, Rules Regulating the Florida Bar.
It should be noted, however, that a member of the plaintiff's bar did testify in opposition to Durie's conduct.
[1] §§ 812.014(1), (2)(b) and 409.910(17), Fla. Stat. (1992).