LAGOA, J.
Cliff Berry, Inc. (“CBI”) and Jeffrey Clint Smith (“Smith”) (collectively “Defendants”) were each convicted by a jury and adjudicated guilty of two counts of first-degree grand theft. In this consolidated appeal of the convictions, the Defendants claim that the trial court erred in refusing to give certain requested jury instructions and in failing to conduct a timely and adequate Richardson[1] hearing. We re *401 verse and remand the matter for a new trial.
1. FACTUAL AND PROCEDURAL HISTORY
Defendant CBI is a provider of environmental services including the removal of waste water to and its subsequent processing at CBI’s treatment facility in Miami. Defendant Smith was CBI’s project manager assigned to oversee the performance of two contracts between CBI and Aircraft Service International Group (“ASIG”), the operator of the fuel storage facility located at the Miami International Airport (the “Fuel Farm”).[2] Both contracts obligated CBI to remove and dispose of certain waste streams, notably, petroleum contaminated water (“PCW”), generated at the Airport and stored at the Fuel Farm.
Under the first contract, effective from May 1, 2000 through September 30, 2001, CBI agreed to remove “PCW” from the Fuel Farm. Under the second contract, effective from October 1, 2001 through July 1, 2004, CBI agreed to remove “PCW from holding tank,” as well as contaminated and uncontaminated jet fuel stored at the Fuel Farm. Although the two contracts contemplated the removal of PCW (and jet fuel, under the second contract) by CBI from May 1, 2000 to July 1, 2004, CBI was temporarily replaced by another vendor, Petrotech, in early 2002. CBI resumed its obligations under the second contract in June 2002. Although neither contract specifies, CBI, ASIG, and the County agreed that when CBI removed PCW under either contract, CBI was to receive payment. In contrast, when CBI removed contaminated or uncontaminated jet fuel, CBI, ASIG, and the County agreed CBI was obligated to pay for the volume of fuel removed. Neither contract defined “petroleum contaminated water” or “PCW.”
The criminal charges filed below involved the Defendants’ removal services and billing practices under the PCW disposal contracts. The State’s theory was that the Defendants submitted fraudulent invoices for the removal of PCW (which resulted in overbilling) and stole contaminated and uncontaminated jet fuel from the Fuel Farm (primarily from Tank 21, the PCW tank). The State’s key witness was Brian Schneir, the maintenance supervisor at the Fuel Farm. Schneir was prosecuted separately for conspiring with other vendors to steal fuel from the Fuel Farm, and testified against Smith and CBI pursuant to a plea agreement with the State.
At trial, Schneir claimed that CBI stole fuel from the Fuel Farm 35 to 42 times from early 2000 to March 2003. Schneir contended that these thefts were from inbound fuel lines (10 to 12 times, 7,500 gallons each time, for a total of 75,000 to 90,000 gallons), from outbound fuel lines (10 to 12 times, 7,500 gallons each time, for a total of 75,000 to 90,000 gallons), during tank cleanings (5 to 6 times, between 10,-000 and 50,000 gallons each time, for a total of 50,000 to 300,000 gallons), and from Tank 21 (10 to 12 times, 7,500 gallons each time, for a total of 75,000 to 90,000 gallons). In sum, Schneir estimated that CBI stole between 275,000 and 570,000 gallons of jet fuel from the Fuel Farm (for which he claimed to receive a kickback in the amount of 30 cents per gallon).[3]
*402 Schneir also testified that, beginning in June or July of 2002, CBI billed ASIG for services it did not render by creating fake trucking manifests (which Schneir approved) for the removal of PCW from the Fuel Farm. According to Schneir, the number of fake manifests CBI fraudulently invoiced each month varied from two or three to seven or eight per month, in Schneir’s discretion. Each fake manifest was for removal of 7,500 gallons of PCW. Thus, in a nine-month period, Schneir estimated that CBI fraudulently invoiced between 135,000 and 540,000 gallons of PCW (for which he claimed to receive a kickback in the amount of 3 cents per gallon).
Schneir’s trial testimony was a drastic departure from his pre-trial sworn statement and deposition, given in May and June 2008, respectively. In his pre-trial testimony, Schneir claimed that CBI began stealing jet fuel from the Fuel Farm and submitting fraudulent invoices for the removal of PCW when CBI resumed its obligations under the second contract in June 2002. According to Schneir, CBI stole jet fuel from various places at the Fuel Farm, including Tank 21, ten to twelve times (maximum) between June 2002 and March 2003. CBI’s truck carried 7,500 gallons at a time; thus, the total amount of fuel Schneir contended CBI took from the Fuel Farm was 75,000 to 90,000 gallons. Thus, Schneir’s trial testimony increased the duration of the crime by two and a half years, and the extent of the crime by 25 to 40 thefts and 200,000 to 480,000 gallons.
With respect to CBI’s removal of PCW, Schneir contended that, on average, CBI fraudulently invoiced three fake manifests per month; CBI never submitted more than five fake manifests in a month and, sometimes, no fake manifests were included in CBI’s monthly bill. Each fake manifest was for 7,500 gallons of PCW. Thus, according to Schneir’s pre-trial testimony, in a given month, CBI may have fraudulently billed for the removal of zero to 37,500 gallons of PCW. Based on Schneir’s trial testimony, in a given month, CBI may have fraudulently billed for the removal of 15,000 to 60,000 gallons of PCW. Schneir’s trial testimony increased the extent of CBI’s fraudulent invoicing by 15,000 to 22,500 gallons.
Although Schneir spent “hours and hours and hours and hours” preparing for trial with prosecutors and/or investigators, and despite the fact that the State was aware that Schneir’s trial testimony would vary significantly from his pre-trial testimony before Schneir took the stand,[4] the State did not indicate to the defense that Schneir would depart from his pre-trial testimony until after Schneir began testifying.[5]
*403 At trial, the Defendants argued that they relied in good faith on the PCW disposal contracts, which failed to distinguish between PCW and contaminated and uncontaminated jet fuel, and therefore, they lacked the requisite intent for criminal liability.
The evidence at trial indicated that PCW and contaminated jet fuel can both be characterized as mixtures of fuel and water. Notably, the second contract defined contaminated jet fuel as “any fuel that is not virgin, i.e., fuel that has been used in flushing ops, tank bottoms sumped by CBI due to cloudiness, water contaminated and unfit for use by ASIG.” However, neither contract defined PCW, and the evidence at trial indicated that the term “PCW’ was susceptible to a number of meanings, including “water contaminated and unfit for use by ASIG” — in other words, contaminated jet fuel. Thus, at least under the second contract, one meaning of the term “PCW” was synonymous with contaminated jet fuel. The contracts simply failed to distinguish or explain the difference between PCW (water containing fuel) and contaminated fuel (fuel containing water).
The State considered the failure of the contracts to distinguish between PCW and contaminated jet fuel insignificant based on the physical properties of the substances. Patricia Nichols, the County employee that supervised the Fuel Farm, testified that because fuel is fighter than water, the contents of Tank 21 tended to separate over time such that a cross-section of the tank would reveal an upper layer of un contaminated jet fuel, a middle layer of contaminated jet fuel, and a bottom layer of PCW. Thus, Ms. Nichols testified, CBI was entitled to be paid only when it removed the PCW at the bottom of Tank 21; if CBI removed the fuel floating in the middle or upper layers of the tank, CBI was obligated to purchase it from the County.[6]
However, the contracts’ failure to define or distinguish PCW from uncontaminated jet fuel provided the basis for the Defendants’ theory of defense. It was undisputed that Tank 21 was used for PCW; according to the Defendants, because all PCW is a mixture of fuel and water, the entire contents of Tank 21 was PCW regardless of the precise fuel-to-water ratio and regardless of whether its contents separated (because the mixture was frequently agitated by the removal and addition of *404 fluids). According to CBI employees, an average PCW mixture contained ten to twenty percent fuel, but fuel-water mixtures that contained anywhere from thirty to ninety percent fuel still qualified as PCW. Likewise, because the entire contents of Tank 21 were contaminated with water, nothing in Tank 21 qualified as uncontaminated or pure jet fuel. Thus, under the contracts, fluids could legitimately be taken from the top, middle, or bottom of Tank 21 and subsequently invoiced for payment as PCW.
The Defendants offered the testimony of Mitch Oceguera, CBI’s truck driver assigned to the Airport contracts, in support of their theory. Oceguera testified that his general practice was to pick up “whatever was in Tank 21.” Oceguera believed that everything in Tank 21 was PCW, regardless of its precise fuel-water percentage, and never believed or had reason to suspect that his conduct, i.e., picking up waste from Tank 21, was illegal.
In addition, the Defendants pointed out that all of CBI’s bills of lading indicated that the material being transported from the Fuel Farm to CBI’s wastewater treatment facility was “Petroleum Contact Water destined for product recovery in accordance with chapter 62-740FAC [sic].” The regulation referenced in the bills of lading defines “Petroleum Contact Water” or “PCW’ as “water containing product.” Fla. Admin. Code R. 62-740.030(1) (2010).[7] The regulation then sets forth a list of examples of materials that meet the foregoing definition of PCW:[8]
1. Condensate from underground and aboveground petroleum tanks.
2. Water bottoms or drawdown water removed from a petroleum storage tank system as defined in Chapters 62-761 and 62-762, F.A.C.
3. Product, or water in contact with product which displays a visible sheen contained in spill containment and secondary containment areas associated with petroleum tank storage, petroleum transportation, and petroleum distribution systems; however, stormwater that displays a visible sheen contained in spill containment and secondary containment areas associated with a diesel or No. 2 fuel storage tank, transportation or distribution system is not PCW.
4. Petroleum tank filler sump and dispenser sump water.
5. Recovered product or water in contact with product, which does not contain hazardous constituents other than petroleum, from first response actions to petroleum spills or from petroleum contamination site cleanups conducted under Chapter 62-770, F.A.C.
6. Aboveground petroleum tank seal leakage water.
7. Pumpable liquids from petroleum tank cleaning operations.
Fla. Admin. Code R. 62-740.030(1)(a).
On cross-examination, Nichols conceded that fuel tank residue remaining after tank cleanings would meet one of the above examples of waste streams constituting PCW. She likewise conceded that there *405 was no pure jet fuel in Tank 21; the contents of the tank were contaminated.[9]
The Defendants relied on a good faith defense at trial, arguing in closing that they lacked the requisite intent to steal because each entertained an honest, but mistaken, belief that he was entitled to remove the contents of Tank 21, the PCW tank, under the contracts.
Consistent with this theory, the Defendants sought to have the jury instructed on their good faith defense. The proposed instruction on good faith was as follows:
“Good faith” is a complete defense to the charges in the Information since good faith on the part of a defendant is inconsistent with intent to defraud or willfulness which is an essential part of these charges. The burden of proof is not on a defendant to prove his good faith, of course, since he has no burden to prove anything. The State must establish beyond a reasonable doubt that the defendant acted with specific intent to defraud as charged in the information.
One who expresses an honestly held opinion, or an honestly formed belief, is not chargeable with fraudulent intent even though the opinion is erroneous or the belief is mistaken; and similarly, evidence which establishes only that a person made a mistake in judgment or an error in management, or was careless, does not establish fraudulent intent.
On the other hand, an honest belief on the part of a defendant that a particular business venture was sound and would ultimately succeed would not, in and of itself, constitute “good faith” as that term is used in these instructions if, in carrying out that venture, the defendant knowingly made false or fraudulent representations to others with the specific intent to deceive them.
Defs.’ Prop’d Jury Inst. No. 22; see Eleventh Circuit Pattern Jury Instructions (Criminal Cases) Special Instruction No. 17 (2003).
In addition to the instruction on good faith, the Defendants proposed an instruction informing the jury that a dispute over the interpretation of a contract does not give rise to criminal liability:
A disagreement over the interpretation of a contract may result in a civil lawsuit but does not create criminal culpability. Likewise, the State cannot prove a criminal theft, fraud or racketeering charge by merely showing that a defendant did not comply with his contractual obligations.
Defs.’ Prop’d Jury Inst. No. 24; see Commonwealth v. Snyder, 40 Pa.Super. 485 (1909).
The Defendants further sought to have the jury instructed on the definition of “petroleum contact water” set forth in the Florida Administrative Code and referenced in each of CBI’s bills of lading.[10] Defs.’ Prop’d Jury Inst. No. 23; see Fla. Admin. Code R. 62-740.030; § 376.301(16), Fla. Stat. (1993).
*406 The trial court refused to give any of the instructions requested by the Defendants. Instead, the trial court gave a variation of the standard instruction for theft, which provided in relevant part:
[T]o prove the crime of Grand Theft as charged ... the State must prove both of the following two elements beyond a reasonable doubt: 1. “The defendant” knowingly and unlawfully obtained, used, or endeavored to obtain or use the funds of the MIAMI-DADE AVIATION DEPARTMENT as charged in Count 15 and JET-A Aviation Fuel as charged in Count 17[;] and 2. He did so with intent to, either temporarily or permanently, deprive the MIAMI-DADE AVIATION DEPARTMENT, as owner or custodian, of funds, as charged in Count 15, and JET-A Fuel as charged in Count 17.
See Florida Standard Jury Instructions in Criminal Cases, The Supreme Court Comm, on Standard Jury Instructions in Criminal Cases, § 14.1 (Oct. 2009).
Nevertheless, the trial court permitted counsel to argue the good faith defense theory in closing, took judicial notice of the Florida Administrative Code definitions, and admitted the definitions into evidence as “Court’s Exhibit No. 2.” The court did not permit the jury to take the definitions into the jury room.
The jury found CBI and Smith guilty of two counts of grand theft and two counts of organized scheme to defraud, and the trial court entered final judgment in accordance with the verdict. The convictions for organized scheme to defraud were subsequently vacated. Smith was sentenced to ten years imprisonment and five years probation on each count, the sentences to run concurrently. CBI was sentenced to fifteen years probation and ordered to pay restitution in the amount of $1,242 million, a fine in the amount of $1,242 million, and $105,500 in court costs. In addition, CBI was prohibited from performing government contracts as a special condition of probation.
This appeal ensued.
II. STANDARD OF REVIEW
“The decision on whether to give a particular jury instruction is within the trial court’s discretion, and, absent ‘prejudicial error,’ such decisions should not be disturbed on appeal.” Card v. State, 803 So.2d 613, 624 (Fla.2001) (quoting Goldschmidt v. Holman, 571 So.2d 422, 425 (Fla.1990)); see also Coday v. State, 946 So.2d 988, 994 (Fla.2006). Nevertheless, in a criminal proceeding, the trial court’s discretion is limited by the defendant’s right to have the jury instructed on any valid theory of defense supported by record evidence. Coday, 946 So.2d at 994. Our examination of a trial court’s decision to withhold a requested jury instruction is governed by the abuse of discretion standard of review. Id. at 995; see also Carpenter v. State, 785 So.2d 1182, 1199-1200 (Fla.2001) (reviewing trial court’s decision regarding jury instructions with a presumption of correctness on appeal); Brickley v. State, 12 So.3d 311, 313 (Fla. 4th DCA 2009) (“When a trial court denies a defendant’s request for a special instruction, the defendant has the burden of showing on appeal that the trial court abused its discretion in giving the standard instruction.” (citing Stephens v. State, 787 So.2d 747, 755-56 (Fla.2001))).
III. ANALYSIS
The Defendants argue that the trial court erred when it refused to give the requested special jury instructions regarding their good faith theory of defense, the definition of PCW set forth in rule 62-740.030, Florida Administrative Code, and the effect of a disagreement regarding *407 contract interpretation. For the reasons discussed below, we agree.
“The office of an instruction to the jury is to enlighten the jury upon questions of law pertinent to the issues of fact submitted to them in the trial of the cause,” Edwards v. Fitchner, 104 Fla. 52, 139 So. 585, 586 (1932), and:
An instruction which tends to confuse rather than enlighten, and which is calculated to and may mislead the jury and cause them to arrive at a conclusion that otherwise might not be reached by them should not be given, and, if given, it is reversible error, especially when an effort was made (but denied) to have a correct charge on the particular point given to the jury by means of a specially requested instruction....
Finch v. State, 116 Fla. 437, 156 So. 489, 492 (1934). Standard instructions are presumed correct and preferred over special instructions, Stephens, 787 So.2d at 755.[11] However, the use of a standard instruction does not relieve the trial court of its duty to ensure that the instruction accurately and adequately conveys the law applicable to the circumstances of the case. See Brown v. State, 11 So.3d 428, 432 (Fla. 2d DCA 2009). A defendant is entitled to a special jury instruction upon proof that “(1) the special instruction was supported by the evidence; (2) the standard instruction did not adequately cover the theory of defense; and (3) the special instruction was a correct statement of the law and not misleading or confusing.” Stephens, 787 So.2d at 756 (footnotes omitted).
A. Good Faith Theory of Defense
It is well-settled in Florida that a criminal defendant is entitled to have the jury instructed on the law applicable to his theory of defense if the theory is legally valid and there is any evidence in the record to support it. State v. Weller, 590 So.2d 923, 927 (Fla.1991); Gardner v. State, 480 So.2d 91, 92 (Fla.1985); Rodriguez v. State, 396 So.2d 798, 799 (Fla. 3d DCA 1981) (“It is ... incumbent upon the court to charge the jury on every defense which is recognized by the law and sustained by a version of the testimony which the jury has a right to accept.”). It is inappropriate for the trial court to weigh the evidence for the purpose of deciding whether to give a requested instruction on the theory of defense; if the evidence at trial suggests the defense, the court should give the instruction. Chavers v. State, 901 So.2d 409, 410 (Fla. 1st DCA 2005). Provided, of course, that the requested instruction satisfies the other requirements of the Stephens analysis.
The theory of defense advanced by CBI and Smith was legally valid. When held in good faith, an honest belief in one’s entitlement to property is a complete defense to the crime of theft, even though the belief may be foolish, unreasonable, or mistaken, because it negates an essential element of the offense. E.g., Rodriguez, 396 So.2d at 799. A defendant cannot be convicted of theft unless the prosecution proves beyond a reasonable doubt that the defendant obtained or used someone else’s property with the specific intent to steal. See § 812.014(1), Fla. Stat. (2009).[12] “This cannot be where the *408 taker honestly believes the property is his own or that of another, and that he has a right to take possession of it for himself or for another for the protection of the latter.” Rodriguez, 396 So.2d at 799 (holding that it was reversible error to fail to give the following requested instruction: “Where it clearly appears that the taking of property was consistent with honest conduct, as where the taker honestly believes that he or she has a right to property, the taker cannot be convicted of theft, even though the taker may have been mistaken.”); see also Philippoussi v. State, 691 So.2d 511, 512 (Fla. 4th DCA 1997). Thus, a defendant’s good faith belief that he is entitled to take the property he is accused of stealing negates the specific intent necessary for commission of the offense and constitutes a legally valid defense to the crime of theft. See Rodriguez, 396 So.2d at 799.
Because the Defendants’ good faith theory of defense is recognized by the law, we must consider whether CBI and Smith introduced “any evidence” entitling them to a jury instruction on the law applicable to their theory. See Id. Initially, we observe that cases holding the defendant was not entitled to an instruction on his good faith theory of defense are premised on either the complete and total lack of evidence to support the defense {no evidence, as opposed to any evidence) or a finding that the evidence supporting the defense was demonstrably false or inconsistent with honest conduct (and thus, not a version of the evidence the jury was entitled to accept). See, e.g., Dreisch v. State, 436 So.2d 1051, 1052 (Fla. 3d DCA 1983) (holding instruction on good faith was properly refused where there was no evidence that defendant “had an honest belief that he had a right to the property in question” and distinguishing cases where defendant was entitled to instruction as supported by the evidence); Durie v. State, 751 So.2d 685, 690 (Fla. 5th DCA 2000) (good faith instruction was properly refused where defendant attorney structured a settlement agreement to avoid assignment of client’s recovery to Medicaid; defendant’s belief in the legality of the agreement was not an honest belief in the client’s entitlement to Medicaid’s money). Evidence sufficient to support an instruction on good faith need not come from the defendant’s testimony.[13] See Gardner, 480 So.2d at 92-93 (“[Ejvidence elicited during the cross-examination of prosecution witnesses may provide sufficient evidence for a jury instruction on [the theory of defense].”); Verdult v. State, 645 So.2d 530, 530 (Fla. 4th DCA 1994) (finding that contracts between defendant convicted of grand theft and alleged victims constituted evidence of defendant’s good faith belief in his entitlement to the property); cf. Owens v. State, 866 So.2d 129, 132 (Fla. 5th DCA 2004) (“As to how the defendant can prove his claim that he actually had such an honest belief, it has been pointed out that the openness of the taking, as well as the reasonableness of the belief, though not conclusive, will buttress his claim of good faith.” (quoting LaFave & Scott, Criminal Law § 85 at 722 (2d ed. 1986))).
We conclude that the evidence at trial was sufficient to suggest the good faith *409 theory of defense advanced by CBI and Smith. The PCW removal contracts themselves constituted evidence of the Defendants’ good faith belief that they were entitled to remove the contents of Tank 21 and invoice the product as “PCW.” See Verdult, 645 So.2d at 530. Neither contract defined “PCW” or “petroleum contaminated water,” nor did they distinguish PCW from “uncontaminated jet fuel,” although both are mixtures of fuel and water. The Florida Administrative Code’s definition of PCW was expressly referenced in each of CBI’s bills of lading, and Nichols conceded on cross-examination that she was familiar with at least two of the examples of PCW set forth in the example. In addition, CBI’s driver testified that he believed everything he picked up from Tank 21 was PCW, and that the PCW removal contracts entitled him to remove anything in the tank. We therefore conclude that the Defendants were entitled to an instruction on their good faith theory of defense, unless the standard instruction was adequate or the special instruction was confusing or misleading. Stephens, 787 So.2d at 755-56.
“The trial court is not required to provide additional instructions if the instructions given are adequate or when a requested instruction would only serve to confuse the jury.” Hughes v. State, 943 So.2d 176, 194 (Fla. 3d DCA 2006); see also Coday, 946 So.2d at 994; Stephens, 787 So.2d at 755-56; Billie v. State, 963 So.2d 837, 839 (Fla. 3d DCA 2007). It is already settled that the standard instruction on the element of intent is insufficient to adequately cover the effect of a defendant’s claim of good faith. See Dudley v. State, 405 So.2d 304, 305 (Fla. 4th DCA 1981) (finding standard instruction on felonious intent required for conviction of grand theft inadequate with respect to the defendant’s good faith theory of defense). “It is one thing to inform the jury as to the state’s obligation to prove each element of its case, but quite another to inform the jury that certain matters, if established, constitute a defense to the crime charged.” Id.
Nevertheless, “the court should not give instructions which are confusing, contradictory, or misleading.” Butler v. State, 493 So.2d 451, 452 (Fla.1986). The language of a challenged instruction is to be considered in light of the other instructions given that bear upon the same subject and “[t]he proper test is whether the charge as a whole adequately presents the law upon the issues.” Kuba v. Leb, 464 So.2d 601, 602 (Fla. 3d DCA 1985); see Mitchell v. State, 958 So.2d 496, 501 (Fla. 4th DCA 2007) (rejecting argument that parsed the language of an instruction “to try to make it seem confusing”). We note that the State failed to object to the defense-requested instructions as confusing or misleading at trial. We therefore conclude that the trial court’s refusal to give the Defendants’ requested special instructions was reversible error.
The dissent contends that the good faith instruction requested by the Defendants was misleading because good faith was only a defense to the theft of jet fuel from Tank 21. Although the dissent prefers to analyze Counts 15 and 17 (charging grand theft) and Counts 14 and 16 (charging organized scheme to defraud) by their component parts — that is, by the “type” of theft that occurred — the fact remains that the State did not so distinguish the alleged thefts in the information,[14] the trial court *410 did not distinguish the alleged thefts in its jury instructions,[15] and the verdict form did not require the jury to find the defendants “guilty” or “not guilty” as to each of the alleged thefts.[16]
B. Florida Administrative Code Definition ofPCW
At the outset, we reject the State’s argument that the Defendants were not entitled to an instruction giving, verbatim, the definition of PCW set forth in Section 62-740.080(1), Florida Administrative Code, and certain other portions of the regulation, because the definition itself is not a valid theory of defense. Pertinent definitions are frequently and routinely included in jury instructions. E.g., Palmore v. State, 838 So.2d 1222, 1224-25 (Fla. 1st DCA 2003); cf. Lynch v. State, 829 So.2d 371, 375 (Fla. 4th DCA 2002). But, more significantly, the law is not as narrow as the State suggests. Where the facts of a particular case render a standard instruction erroneous or inadequate, the trial court has an affirmative responsibility to modify, amend, or give such other instructions, as the court “shall determine to be necessary to instruct the jury accurately and sufficiently on the circumstances of the case.” Fla. R.Crim. P. 3.985. The fact that a definition is not a theory of defense does not render it irrelevant or unnecessary if the definition is “central to the defense.” Keller v. State, 849 So.2d 385, 387 (Fla. 2d DCA 2003) (reversing, in prosecution for vehicular homicide, trial court’s refusal to give defense-requested special instruction on traffic regulation prohibiting left turns against the right-of-way where defendant sought to prove he was not the proximate cause of the accident on which the charges were founded); see also Butler v. State, 493 So.2d 451, 452 (Fla.1986) (“Jury instructions must relate to issues concerning evidence received at trial.”); Mitchell, 958 So.2d at 501 (concluding trial court erred when it refused to give special instruction that was “necessary” for the jury to consider the theory of defense). Where the term defined is beyond the scope of common experience, an instruction is especially appropriate. See Strong v. State, 853 So.2d 1095, 1098 (Fla. 3d DCA *411 2003) (holding trial court’s instruction of statutory definition proper and distinguishing cases to the contrary on the basis that no statute was involved and “the common experience of the jurors could be trusted” to inform their decision). In some circumstances, a court’s obligation to instruct the jury is “best performed by simply giving the terms of the statute.” Cook v. State, 46 Fla. 20, 35 So. 665, 670 (1903) (considering instruction on jury’s ability to recommend the defendant to the mercy of the court).
We note that “[ijnstructions quoting an applicable statute have been upheld.” Strong, 853 So.2d at 1098; see also Driggers v. State, 38 Fla. 7, 20 So. 758, 760 (1896) (finding no error where trial court gave instruction that quoted the statutory definition of justifiable homicide); Rains v. State, 955 So.2d 39, 41 (Fla. 5th DCA 2007) (holding trial court did not abuse its discretion where jury instruction tracked the language of a statute); Location 100, Inc. v. Gould S.E.L. Computer Sys., Inc., 517 So.2d 700, 705-06 (Fla. 4th DCA 1987) (finding no error in trial court’s decision to give instruction consisting of statutory definition, even though definition was created for a different context, where interpretation of the subject contract was a question of fact for the jury), called into doubt on other grounds by Caufield v. Cantele, 837 So.2d 371 (Fla.2002); Luke v. State, 204 So.2d 359, 363 (Fla. 4th DCA 1967) (“It seems settled that where the law involved is set forth in a statute it is usual, proper and sufficient ... to charge the jury in the language of such statute.” (citing 16 Fla. Jur. Homicide § 160)); cf. Maxwell v. Wainwright, 490 So.2d 927, 931 (Fla.1986) (noting that argument urging the insufficiency of a jury instruction was without merit where instruction followed language of statute as construed); Brown, 11 So.3d at 433 (“We note that ‘[rjeading a statute to the jury as an instruction is not necessarily erroneous.’ ” (quoting Ruskin v. Travelers Ins. Co., 125 So.2d 766, 769 (Fla. 2d DCA 1960))).
Of course, instructions that quote the language of an applicable statute or agency regulation are no exception to the general rules establishing basic safeguards. To rephrase the Stephens analysis articulated above, “a charge taken from a statute must be justified by the evidence; it must be pertinent to the case; it must be confined to the issues in the case; and it must not mislead the jurors.” Brown, 11 So.3d at 433 (quoting Ruskin, 125 So.2d at 769); see also Strong, 853 So.2d at 1098 (“What is important is that sufficient instructions ... be given as adequate guidance to enable a jury to arrive at a verdict based upon the law as applied to the evidence before them.” (quoting State v. Bryan, 287 So.2d 73, 75 (Fla.1973))).
The Defendants’ proposed instruction was a verbatim statement of portions of Section 62-740.030, Florida Administrative Code; it cannot be said to inaccurately state the law or pose any serious risk of misleading the jury. Because each of CBI’s bills of lading referenced Section 62-740, the definition of PCW was pertinent the jury’s consideration of the issues raised at trial and was supported by the evidence. Thus, we conclude that the trial court should have given the instruction. See Brown, 11 So.3d at 433.
We are not persuaded that permitting defense counsel to argue the definition of PCW to the jury in closing was an adequate substitute for an instruction from the court. “[T]he jury must apply the law as given by the court’s instructions, rather than counsel’s arguments.” Gardner, 480 So.2d at 93; see also Keyes Co. v. Shea, 372 So.2d 493, 495 (Fla. 4th DCA 1979) (holding trial court’s failure to instruct the jury as to the proper *412 measure of damages was erroneous despite permitting counsel to argue the issue to the jury); Boyde v. California, 494 U.S. 370, 384, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990) (“[Arguments of counsel generally carry less weight with a jury than do instructions from the court.”).[17] The comparative value of arguments by counsel and instructions by the court, through the eyes of the jury, cannot be underestimated given the fact that, “particularly in a criminal trial, the judge’s last word is apt to be the decisive word.” Blitch v. State, 427 So.2d 785, 787 (Fla. 2d DCA 1983) (quoting Bollenbach v. United States, 326 U.S. 607, 612, 66 S.Ct. 402, 90 L.Ed. 350 (1946)).[18] Thus, we conclude that the trial court’s refusal to give the Defendants’ special instruction regarding the statutory definitions was reversible error.
C. Disagreement Regarding Contract Interpretation
In a criminal proceeding, a specific and distinct objection to the giving or failing to give an instruction is necessary to preserve an issue for appellate review. See Fla. R.Crim. P. 3.390(d); Middelveen v. Sibson Realty, Inc., 417 So.2d 275, 277 n. 2 (Fla. 5th DCA 1982); see also Coday, 946 So.2d at 995 (“Issues pertaining to jury instructions are not preserved for appellate review unless a specific objection has been voiced at trial.” (quoting Overton v. State, 801 So.2d 877, 901 (Fla.2001))).
The construction of a contract is generally a matter of law; however, where the terms of a written instrument are disputed and reasonably susceptible to more than one construction, or where construction involves reference to extrinsic facts, the ambiguity must be resolved by the trier of fact with proper instructions. State Farm Fire & Cas. Co. v. De Londono, 511 So.2d 604, 605 (Fla. 3d DCA 1987); Zarranz v. Coral Gables Hosp., Inc., 591 So.2d 323, 324 (Fla. 3d DCA 1991); Location 100, Inc., 517 So.2d at 705. The evidence at trial indicated that the PCW removal contracts were reasonably susceptible to competing interpretations and construction of the agreements involved reference to extrinsic facts; thus, the interpretation of the contracts was properly submitted to the jury. See Myrck v. St. Catherine Laboure Manor, Inc., 529 So.2d 369, 372 (Fla. 1st DCA 1988) (agreement that failed to specify which party was responsible for certain expenses was ambiguous); De Londono, 511 So.2d at 605 (insurance policy that failed to define key term, disputed as to meaning and reasonably susceptible to different interpretations, presented issue of fact properly submitted to the jury).
We are aware of no authority imposing a criminal penalty for the mere violation of a contract; and, while we acknowledge that in appropriate circumstances, a contract may underlie a conviction, e.g., § 877.10(1), Fla. Stat. (2009) (prohibiting the making of dual contracts *413 for the purchase or sale of real property), the mere violation of the contract’s terms exposes the breaching party to civil liability, not criminal culpability.[19] See United States v. Chandler, 388 F.3d 796, 801 (11th Cir.2004) (identifying as “well-settled” the policy that the “rules of a private contest are mere offers for a unilateral contract, violation of which either voids or breaches the contract” and applying the rule of lenity to reverse convictions). Application of the rule of lenity[20] has not been limited to criminal statutes. See id. at 805 (“The rule of lenity requires that a criminal conviction not be predicated upon a problematic interpretation and retroactive application of the rules of a private game.”); State v. Mounce, 866 So.2d 132, 134 (Fla. 5th DCA 2004) (rejecting argument that the rule of lenity was inapplicable to a civil statute mandating registration, because the consequence of noncompliance with the statute was conviction of a felony, not merely imposition of a civil penalty); Key v. State, 837 So.2d 535, 537 (Fla. 2d DCA 2003) (applying principles of lenity to resolve doubt concerning the meanings of terms in favor of defendant). Where, as here, the interpretation of an ambiguous contract involves the possibility of criminal conviction, the rule of lenity requires that any doubt be resolved in favor of the accused; if a jury is to interpret the contract, an instruction to that effect is appropriate. Because the trial court failed to give the Defendants’ special instruction regarding a disagreement over the interpretation of a contract, the jury was permitted to resolve the contract’s ambiguity against the Defendants. Thus, we conclude that the trial court’s refusal to give the Defendants’ requested special instruction regarding disputed contract interpretation was reversible error.
D. Discovery Violation
Lastly, we address the trial court’s failure to conduct a timely and adequate Richardson[21] hearing after being alerted, during the trial, to a potential discovery violation involving the changed testimony of Brian Schneir, the State’s key witness. While we need not reach this issue, as we are reversing and granting a new trial, we find it necessary to address the merits of this issue in light of the dissent’s heavy reliance on Schneir’s testimony to support the conclusion that “the majority of the jet fuel stolen was Jet A Fuel-Non Contaminated.”
1. Preservation of this Issue for Appellate Review
The dissent argues that defense counsel did not preserve the Richardson issue for appellate review because defense counsel failed to make an objection based on Richardson and failed to request a Richardson hearing. “There are no exact ‘magic words’ or phrases which must be used by the defense in order to necessi *414 tate the [Richardson] inquiry; only the fact that a discovery request has not been met.” Jones v. State, 32 So.3d 706, 710 (Fla. 4th DCA 2010) (quoting Smith v. State, 7 So.3d 473, 506 (Fla.2009)); see also C.D.B. v. State, 662 So.2d 738, 741 (Fla. 1st DCA 1995); Brown v. State, 640 So.2d 106 (Fla. 4th DCA 1994); Raffone v. State, 483 So.2d 761, 764 (Fla. 4th DCA 1986) (“While the defendants did not recite particular magic words, the manner in which they brought the matter to the trial court’s attention was more than sufficient to apprise the court of the nature of their complaint.”). In Jones, the Fourth District explained:
Once a trial court has notice of a discovery violation, the court must conduct a Richardson hearing to inquire about the circumstances surrounding the state’s violation of the discovery rules and examine the possible prejudice to the defendant. This requirement applies when the court learns of a possible discovery violation, in order to determine whether there has been an actual discovery violation. It also applies even if the defendant does not request a Richardson hearing.
Id. at 710-11 (citations omitted; emphasis added).
The record demonstrates that on November 26, 2008 — the day Schneir began testifying and before the State concluded its direct examination — defense counsel alerted the trial court to a possible discovery violation after it became clear that Schneir’s trial testimony was a significant departure from his pre-trial statements and deposition:
[DEFENSE COUNSEL]: Judge, one request before we break, it’s through the Court to the prosecutors.... Apparently now, with Mr. Schneir[’s] testimony and questions, it’s clear that Mr. Schneir’s testimony is at odds with both his sworn [testimony] in May to the prosecutors, and his deposition in June. And I’m asking if there are other statements, interviews or notes that occurred since that time, that are inconsistent with his prior testimony, that under Brady, that they be produced.
[[Image here]]
THE COURT: So you’re invoking Brady, and I’m assuming, Mr. Scruggs, you’re aware of that, and anything they are entitled to, you have turned over?
(Tr. 1545^16.) The prosecutor denied being in possession of any such materials and asserted that “if I had any such reports or anything, they would have gotten them a long time ago.” (Tr. 1546.) Defense Counsel continued:
It’s clear from the question asked about dates and how he [Schneir] lied and all the meetings about dates, that Mr. Scruggs, before he asked these questions, knew that the testimony was going to vary from the sworn testimony previously given.
I believe that the oral statements have been made to Mr. Scruggs or to Mr. Fiedler that are inconsistent, that is within the obligation the prosecutor owes, and I cannot believe that Mr. Scruggs asked the questions, and is surprised to hear that now the witness is testifying in variance.
So, I think there are statements out there, with all respect to Mr. Scruggs that Mr. Scruggs knows perfectly well and I ask for them now.
(Tr. 1546.) In the exchange with the trial court that followed, the prosecutor agreed to think about and produce any undisclosed oral or written statements to the defense over the holiday weekend.
As we have already noted, based on the Assistant State Attorney’s Script, it is clear that the State was aware Schneir *415 would depart significantly from his pretrial sworn statement and deposition at trial before Schneir took the stand. For example, the Script summarizes the information the Assistant State Attorney expected to elicit from Schneir as follows:
• “Theft actually started in early 2000.”
• With respect to the outbound fuel lines, fuel was stolen “approx. 12 times in 2000 to March 2003,” and with respect to the inbound fuel lines, fuel was stolen “approx. 12 times.”
(Script, at R. P3864-65.) The Script also outlines questions the Assistant State Attorney planned to (and did, in some form) ask Schneir at the trial:
• “Why lower numbers [and] wrong times for fuel theft?”
• “Why did you give wrong dates in depo?”
• “Why did you give wrong numbers/times in depo?” (Below this series of questions, the words “MINIMIZE INVOLVEMENT” were written in another person’s handwriting. These are the exact words Schneir used at trial to explain his departure from his pre-trial testimony.)
(Script, at R. P3370.) And, in fact, the Assistant State Attorney later confirmed at a post-trial hearing that he learned of the changes in Schneir’s testimony the weekend before Schneir took the stand. The State failed to notify the defense that Schneir’s testimony had changed until after Schneir began testifying, and, exactly what the State told the defense is all but certain, as the dissent suggests. The State’s “disclosure” was not made on the record and, according to defense counsel’s recollection, was only a general statement as to Schneir’s changes. (See Tr. Cntd. Hrg. Mtn. for New Trial, at R. P3704, P3697.) The State’s direct examination of Schneir resumed after Thanksgiving on December 3, 2008.
To preserve the Richardson issue for this Court’s review, defense counsel was not required to say any “magic words,” such as “Richardson ” or “objection.” See Jones, 32 So.3d at 710-11. Richardson only requires that the possible discovery violation be “brought to the attention of the trial court during the course of the proceedings.” Richardson, 246 So.2d at 776. The defense counsel’s comments to the trial court regarding Schneir’s change in testimony was sufficient to bring the possible discovery violation to the trial court’s attention and to trigger the trial court’s duty to conduct a Richardson inquiry into the circumstances surrounding the discovery violation.[22] See Williams v. State, 513 So.2d 684 (Fla. 3d DCA 1987) (holding trial court erred when it failed to conduct a Richardson inquiry after learning, through a motion alleging a Brady violation, that the state failed to disclose information requested in discovery); see also State v. Evans, 770 So.2d 1174, 1182 (Fla.2000) (error preserved where discovery violation was raised during the state’s direct examination); Smith v. State, 7 So.3d 473, 505-06 (Fla.2009) (error preserved where discovery violation was raised after the state’s direct examination); Powell v. State, 912 So.2d 698, 700-01 (Fla. 2d DCA 2005) (error preserved where discovery violation was raised during cross-examination); compare Guzman v. State, 42 So.3d 941, 944 (Fla. 4th DCA 2010) *416 (error not preserved where discovery violation was raised after cross-examination of witness was complete), review denied, 56 So.3d 766 (Fla.2011). “At the very least, the judge should have made an inquiry for the record and determined whether this constituted a violation or not.” Barrett v. State, 649 So.2d 219, 222 (Fla.1994).
The dissent argues that Major v. State, 979 So.2d 243 (Fla. 3d DCA 2007) and Lucas v. State, 376 So.2d 1149 (Fla.1979), support the conclusion that the Richardson issue was not preserved. These cases are distinguishable.
In Major, the defendant did not raise the possibility of a discovery violation during the direct examination of the relevant witness; nor did the defendant request a Richardson hearing or move for a mistrial upon learning of the witness’s changed opinion. Major, 979 So.2d at 245. Instead, the defense counsel impeached the witness with prior inconsistent statements on cross-examination and waited until direct appeal to raise the discovery violation for the first time. Id. In contrast, the record here demonstrates that defense counsel raised the discovery violation before Schneir’s direct examination was complete and before conducting any cross-examination. In addition, defense counsel later moved for a mistrial based on the state’s failure to disclose the full extent of Schneir’s changed testimony. See Guzman, 42 So.3d at 943 (distinguishing Major based on Major’s failure to raise discovery violation at any time during the trial, and instead, raising violation for the first time on appeal); Jones, 32 So.3d at 711 (distinguishing Major based on Major’s failure to raise any objection whatsoever to the changed opinion of the state’s medical examiner).
In Lucas, the state called an undisclosed rebuttal witness and defense counsel did no more than state, “Your honor, what I am looking for is my witness list provided to me by the State in this matter.” Lucas, 376 So.2d at 1150. The trial court responded that “[rjebuttal witnesses] do[] not have to be furnished.” Id. Defense counsel deferred to the trial court’s statement of the law and failed to raise the issue again. Id. at 1151-52. The record here demonstrates that defense counsel brought the state’s non-compliance to the trial court’s attention when it became clear that Schneir’s trial testimony was contrary to his pre-trial statements and deposition, and further, that defense counsel raised the issue again in a subsequent motion for a new trial. As such, we find the issue preserved for purposes of appellate review, and we now turn to the merits of the Richardson issue before us.
2. The Merits of the Discovery Issue
In his pre-trial sworn statements and a pre-trial deposition, Schneir contended that the Defendants began stealing jet fuel from the Fuel Farm in June 2002. At trial, Schneir testified that the theft of jet fuel began much earlier, in January 2000. Schneir’s trial testimony at least doubled or tripled the amount of fuel he claimed the Defendants stole from the fuel farm and dramatically increased the duration of the crime. Although the State was aware that Schneir’s testimony at trial would drastically vary from his pre-trial sworn statement and deposition, the State failed to notify disclose the Defendants until Schneir had taken the stand.
The Defendants argue that the State violated disclosure obligations imposed by Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Florida Rule of Criminal Procedure *417 3.220.[23] At the outset, we observe that Schneir’s changed testimony is not Brady material. See United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (limiting evidence within the scope of Brady to exculpatory or impeachment evidence). The changes in Schneir’s testimony were incriminating, not exculpatory, and although Schneir’s trial testimony left him open to impeachment based on his pre-trial sworn statements and deposition, the pre-trial statements and deposition constituted the impeachment evidence, not the trial testimony itself. See Mordenti v. State, 894 So.2d 161, 170 (Fla.2004) (holding State violated Brady where State failed to disclose witness’s date book because the book revealed information that indicated various inconsistencies in the witness’s trial testimony).
However, even though Schneir’s changed testimony was not a Brady violation “we still must consider whether the State’s failure to disclose this new statement constituted a violation of Florida’s discovery rules and, if so, whether the violation ‘materially hindered the defendant’s trial preparation or strategy.’ ” Smith, 7 So.3d at 503 (quoting Scipio v. State, 928 So.2d 1138, 1150 (Fla.2006)). We conclude that the State’s failure to disclose the changed testimony constitutes a violation of its duty under Rule 3.220(j), which imposes a continuing duty to disclose. See Elghomari v. State, 66 So.3d 416, 420 (Fla. 4th DCA 2011) (noting that the State has an obligation to disclose an “oral statement [that] materially alters a prior written or recorded statement previously provided by the State to the defendant” (quoting State v. McFadden, 50 So.3d 1131, 1133 (Fla.2010))).
“When the State’s failure to comply with the rules of discovery is brought to the court’s attention, the court must conduct a Richardson hearing to determine if that failure has prejudiced the defendant.” Barrett v. State, 649 So.2d 219, 221-22 (Fla.1994). The inquiry at that hearing is “whether there is a reasonable possibility that the discovery violation ‘materially hindered the defendant’s trial preparation or strategy.’ ” Scipio v. State, 928 So.2d 1138, 1150 (Fla.2006) (quoting State v. Schopp, 653 So.2d 1016, 1020 (Fla.1995)). An analysis of procedural prejudice “considers how the defense might have responded had it known about the undisclosed piece of *418 evidence and contemplates the possibility that the defense could have acted to counter the harmful effects of the discovery violation.” Id. at 1149. It is immaterial whether the discovery violation would have made a difference to the fact finder in arriving at the verdict. Id. at 1150.
Casica v. State, 24 So.3d 1236, 1240 (Fla. 4th DCA 2009).
Here, the trial court erred in failing to conduct a timely Richardson hearing after defense counsel raised the potential discovery violation. See Snelgrove v. State, 921 So.2d 560, 567 (Fla.2005) (“Richardson mandates that once a discovery violation is revealed, the trial court must conduct an inquiry to determine the sanctions that should be imposed on the violating party.”); Landry v. State, 931 So.2d 1063, 1065 (Fla. 4th DCA 2006) (“A Richardson hearing is required when there is a possible discovery violation in order to flesh out whether there has indeed been a discovery violation.”). Instead, the trial court conducted an inquiry post-trial. The inquiry conducted at the post-trial hearing on the Defendant’s motion for a new trial did not constitute an adequate or sufficient Richardson hearing.
“In conducting a Richardson hearing, the trial court must inquire as to whether the violation (1) was willful or inadvertent; (2) was substantial or trivial; and (3) had a prejudicial effect on the aggrieved party’s trial preparation.” State v. Evans, 770 So.2d 1174, 1183 (Fla.2000). Regarding the third factor: “[T]he defense is procedurally prejudiced if there is a reasonable possibility that the defendant’s trial preparation or strategy would have been materially different had the violation not occurred. Trial preparation or strategy should be considered materially different if it reasonably could have benefited the defendant.”
Thomas v. State, 63 So.3d 55, 59 (Fla. 4th DCA 2011) (quoting State v. Schopp, 653 So.2d 1016, 1020 (Fla.1995)).
First, as discussed above, the trial court failed to conduct the inquiry at the time it was made aware by defense counsel that a discovery violation occurred. See Snelgrove, 921 So.2d at 567-68 nn. 14-15 (distinguishing between State’s Brady and Richardson obligations and observing that Richardson does not generally apply in the post-conviction context); Thomas, 63 So.3d at 60 (“[W]e hold that upon being notified by [defendant] of an alleged discovery violation, the trial court was required to conduct a Richardson inquiry.”) (emphasis added). Second, even if the trial court’s post-trial hearing was timely, the trial court never determined whether the violation was willful or inadvertent or if it was trivial or substantial.
Lastly, even assuming that the inquiry was timely, the inquiry was inadequate and insufficient because the trial court did not require the State to demonstrate the lack of procedural prejudice. Instead, the trial court shifted the burden to the defense to demonstrate prejudice. See Thomas, 63 So.3d at 59 (“[I]mposing the burden on the defendant to demonstrate prejudice instead of determining the circumstances of the discovery violation and requiring the State to demonstrate lack of prejudice to the defendant, does not satisfy the procedure contemplated by Richardson.”). “Because it is the State’s burden to show that the error was harmless, the State must show in the record that the defendant was not prejudiced by the discovery violation.” Casica, 24 So.3d at 1241. “A discovery violation is harmless only if an appellate court can determine, beyond a reasonable doubt, that the *419 defense was not proeedurally prejudiced.” Id. at 1240.
We hold that the State did not meet its burden of showing that the discovery violation was harmless. At the post-trial hearing, the trial court focused on defense counsel’s ability to impeach Schneir with his prior inconsistent statements and deposition, and observed:
[H]ow would things have come out differently when you have a guy sitting on the stand who was absolutely skewered with inconsistencies, who said yeah, I lied.
Now, I heard [counsel for Smith] say last week,' oh yeah, yeah, we would have taken this person’s depo that we weren’t going to take otherwise, we would have taken this person’s depo and that person’s depo, and you know,
A. there were four years to take all those people’s depos, but B, even if you had taken them, what they probably would have said is this guy is a liar. And he admitted he was a liar about a number of things, but he maintained all along that these incidents happened, and there was corroborating testimony, not from again, upstanding citizens, because I didn’t [see] anybody in this case who I thought was an upstanding citizen except the lawyers. So I mean I just, I fail to see how this would have been different.
(T. 3722-23.). We think these comments, among others, demonstrate that the trial court erroneously considered it the Defendants’ burden to establish prejudice. This shifting of the burden rendered the inquiry insufficient. Thomas, 63 So.3d at 60 (holding trial court’s Richardson inquiry insufficient where court did not require State to show lack of procedural prejudice and instead, inquired only of defense counsel how the defense would be prejudiced). Indeed, because the trial court failed to conduct an adequate Richardson hearing, the trial court lacked discretion to find the State’s nondisclosure harmless. Id. at 59 (“[T]he trial court has discretion to determine whether a discovery violation would result in harm or prejudice to the defendant, [but] ‘the court’s discretion can be properly exercised only after the court has made an adequate inquiry into all of the surrounding circumstances.’ ” (quoting Barrett, 649 So.2d at 222)); see also State v. Hall, 509 So.2d 1093, 1096 (Fla.1987) (observing that the trial court has discretion to determine whether state’s noncompliance resulted in harm or prejudice only after conducting an adequate inquiry of the circumstances).
The defense’s pre-trial strategy (articulated in defense counsel’s opening statement) involved demonstrating that Schneir’s testimony that the Defendants began stealing jet fuel in June 2002 was inconsistent with the testimony of two other key prosecution witnesses expected to testify that the theft of fuel began sometime in 2000. The defense was forced to abandon this theory when Schneir testified at trial that the theft of jet fuel began in January 2000, rendering the State’s evidence consistent. In addition, Schneir’s trial testimony greatly increased in magnitude the nature of his accusations against the Defendants. The defense was entitled to rely on the accuracy of the information previously disclosed by the prosecution, i.e., Schneir’s pre-trial sworn statements. See McArthur v. State, 671 So.2d 867, 870 (Fla. 4th DCA 1996). Thus, the State’s failure to disclose the substance of Schneir’s changed testimony rendered pri- or disclosures “misleading” and “inaccurate” and was “tantamount to providing no discovery at all.” Id. Consequently, we cannot say beyond a reasonable doubt that the defense was not proeedurally prejudiced by the discovery violation. See Ev *420 ans, 770 So.2d at 1183 (“[O]nly if the appellate court can say beyond a reasonable doubt that the defense was not procedurally prejudiced by the discovery violation can the error be considered harmless.” (quoting Schopp, 653 So.2d at 1021)).
As such, we find that the error was not harmless, and therefore conclude that the trial court’s failure to conduct a timely and adequate Richardson hearing to assess the State’s discovery violation constitutes a separate and independent basis for reversal.
IV. CONCLUSION
For the foregoing reasons, the judgments of conviction and sentences are reversed and the cause is remanded for a new trial.
Reversed and remanded.
SUAREZ, J., concurs.

. Richardson v. State, 246 So.2d 771 (Fla.1971).

. ASIG managed the Fuel Farm pursuant to a contract with Miami-Dade County (the "County”). The airlines operating at the Airport shared the expenses associated with the operation and maintenance of the Fuel Farm.

. We stress that Schneir's figures were estimates only; he was unable to quantify with certainty the quantity of fuel he claimed CBI illegally removed. (See Tr. 1655 (Assistant State Attorney asks Schneir "Do you have any way of, at this point right now, of quantifying *402 ... how much fuel was taken during the 2000-2003 time period?” and Schneir answers "No. No.”).) The verdict form did not require the jury to make any finding as to the number of gallons of jet fuel CBI stole.

. Based on notes taken by the Assistant State Attorney and given to Schneir before he testified (hereinafter referred to as the "Script”), it is evident that the State was aware Schneir would depart significantly from his pre-trial sworn statement and deposition at trial. (See Tr. Schneir Sentencing Hrg. dated Jan. 26, 2009, at R. P3663; see also R. P3362-80.) At the continued hearing on the Defendants' motion for a new trial, the Assistant State Attorney represented that he learned of the changes in Schneir's testimony the weekend before Schneir took the stand. (Tr. Cntd. Hrg. Mtn. for New Trial, at R. P3703.)

. The State made no disclosure regarding Schneir’s changed trial testimony to the defense on the record. There appears to be a factual dispute as to the timing of the State’s disclosure; however, die attorneys agree that the State did not mention Schneir’s change in testimony to the defense until after Schneir had taken the stand. (Tr. Schneir Sentencing Hrg. Dated Jan. 29, 2009, at R. P3590.) Further, the contents of the State’s disclosure are unclear. (See Tr. Cntd. Hrg. Mtn. for New *403 Trial, at R. P3704 (Assistant State Attorney states: "I think I said dates, number of times, and amount of money.”); R. P3697 (Counsel for CBI summarizing discussion between Smith’s counsel and Assistant State Attorney: "At the end of that day [the first day of Schneir’s trial testimony], ... that’s when Mr. Scruggs said for the first time generally, well he is going to change his testimony on the numbers, they’ll be more dollars, more gallons, going back more years, in general.”).).

. CBI and Smith raise a number of other points on appeal. Because we conclude the trial court's refusal to give the defense-requested instructions was reversible error, it is unnecessary to address all of the other points on appeal. However, because we have remanded the cases for a new trial, we note that the trial court erred in permitting Ms. Nichols, who is not an expert, to provide lay opinion testimony as to how CBI’s contract should be interpreted concerning whether CBI was required to pay for the PCW mixture removed from Tank 21 when the fuel was floating on top or when CBI could resell it. Contractual interpretation is not a proper matter of lay opinion testimony. See § 90.701, Fla. Stat. (2009); Murphy v. State, 642 So.2d 646 (Fla. 4th DCA 1994); United States v. Crawford, 239 F.3d 1086, 1090 (9th Cir.2001) (stating that ”[t]he lay witness may not ... testify as to a legal conclusion, such as the correct interpretation of a contract” (citing Evangelista v. Inlandboatmens Union of the Pacific, 777 F.2d 1390, 1398 n. 3 (9th Cir.1985))).

. The same section of the Florida Administrative Code defines "[p]roduct” as "petroleum product as defined in Section 376.301(16), F.S. (1993).” Fla. Admin. Code R. 62-740.030(4). Section 376.301(16), Florida Statutes (1993), defines [p]etroleum product” as “any liquid fuel commodity made trom petroleum, including, but not limited to, all forms of fuel known or sold as diesel fuel, kerosene, all forms of fuel known or sold as gasoline, and fuels containing a mixture of gasoline and other products.”

. The regulation also sets forth a list of exam-pjes 0f materials that do not meet the definition of pcW; howeverj none are relevant jiere

. Ms. Nichols testified as follows:
Q: Tank 21 is not, is not pure jet fuel?
A: No.
Q: It’s contaminated?
A: Yes.
Q: Everything in tank 21 is contaminated in some way?
A: It would not meet the specificátion for jet fuel.
(Tr. 1199-1200.)

. The proposed instruction set forth, verbatim, the Florida Administrative Code definitions of "petroleum contact water” or "PCW,” "product,” "recovery facility,” and "transporter,” followed by the seven examples of materials meeting the definition of PCW. See Fla. Admin. Code R. 62-740.030; § 376.301(16), Fla. Stat. (1993). The relevant portions of the Florida Administrative Code are quoted in this opinion.

. A special instruction is an instruction not contained in the standard jury instructions. 22 Fla.Crim. P. § 18.6 (2010 ed.); see also Black’s Law Dictionary 936 (9th ed. 2009) ("An instruction on some particular point or question involved in the case,” usually "in response to counsel’s request for such an instruction.”); Brown v. State, 11 So.3d 428, 432 (Fla. 2d DCA 2009) ("Of course, the special instruction at issue in this case does not appear in the Standard Jury Instructions.").

. "A person commits theft if he or she knowingly obtains or uses, or endeavors to obtain or to use, the property of another with intent *408 to, either temporarily or permanently: (a) Deprive the other person of a right to the property or a benefit from the property[;] (b) Appropriate the property to his or her own use or to the use of any person not entitled to the use of the property.” § 812.014(1)(a)-(b), Fla. Stat. (2009).

. Indeed, we would find such a requirement troubling, given a criminal defendant’s right to elect not to testify.

. The State’s Amended Information charged the Defendants with the theft of "FUNDS,” see Count 15, Am. Info., at R. P466, and "JET-A AVIATION FUEL,” see Count 17, Am. *410 Info., at R. P468. Likewise, the State's Amended Information charged the Defendants with engaging in a scheme to defraud the Miami-Dade Aviation Department of "FUNDS,” see Count 14, Am. Info., at R. P465, and "JET-A AVIATION FUEL,” see Count 16, Am. Info., at R. P467.

. As to Counts 15 and 17, the trial court instructed the jury as follows: “[T]o prove the crime of Grand Theft as charged in Counts 15 and 17, the State must prove both of the following two elements beyond a reasonable doubt: 1. 'The defendant'knowingly and unlawfully obtained, used, or endeavored to obtain or use the funds of the MIAMI-DADE AVIATION DEPARTMENT as charged in Count 15 and JET-A Aviation Fuel as charged in Count 17. and 2. He did so with intent to, either temporarily or permanently, deprive the MIAMI-DADE AVIATION DEPARTMENT, as owner or custodian, of funds, as charged in Count 15, and JET-A Fuel as charged in Count 17...." See Jury Insts., at R. P2719-20. As to Counts 14 and 16, the trial court instructed the jury as follows: "[T]o prove the crime of Organized Scheme to Defraud, in Counts 14 and 16, the State must prove both of the following two elements beyond a reasonable doubt: 1. 'The defendant’ willfully engaged in a scheme to defraud as defined below; and 2. 'The defendant’ obtained property, to wit: Funds of the MIAMI-DADE AVIATION DEPARTMENT, as charged in Count 14, and JET-A Aviation Fuel, as charged in Count 16...." See Jury Insts., atR. P2717-18.

. As to Counts 15 and 17, the jury found the Defendants "Guilty of Grand Theft, as charged, and the value of the property taken was ... $100,000 or more.” As to Counts 14 and 16, the jury found the Defendants "Guilty of Organized Scheme to Defraud, as charged, and the value of the property obtained was ... $50,000.00 or more.”

. In Boyde, the Court explained that arguments of counsel "are usually billed in advance to the jury as matters of argument, not evidence, and are likely viewed as the statements of advocates,” while instructions "are viewed as definitive and binding statements of the law.” 494 U.S. 370, 384, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990) (internal citations omitted).

. We note that the trial court took judicial notice of the Florida Administrative Code’s definition of PCW and "let it in" as "Court Exhibit No. 2.” Although the trial court’s decision to permit the jury to take "things received in evidence” to the jury room is discretionary, Fla. R.Crim. P. 3.400(a)(3), given the significance of the definition to the Defendants’ good faith theory, at minimum "Court Exhibit No. 2” should have been available to the jury in the jury room.

."[N]o felony can exist under Florida law unless created by a valid statute properly approved by the legislature.” B.H. v. State, 645 So.2d 987, 992 (Fla.1994); see also Art. X, § 10, Fla. Const. ("The term ‘felony’ as used herein and in the laws of this state shall mean any criminal offense that is punishable under the laws of this state, or that would be punishable if committed in this state, by death or by imprisonment in the state penitentiary.”) (emphasis added). We are not aware of any statute criminalizing the mere breach of a contract.

. Florida’s rule of lenity provides: ”[t]he provisions of this code and offenses defined by other statutes shall be strictly construed; when the language is susceptible of differing constructions, it shall be construed most favorably to the accused.” § 775.021(1), Fla. Stat. (2009).

. Richardson v. State, 246 So.2d 771 (Fla.1971).

. Defense counsel’s comments on the record indicated: (1) that Schneir had given a pretrial sworn statement and deposition; (2) that his trial testimony was inconsistent with his pre-trial testimony; (3) that the questioning on direct examination indicated the prosecution knew Schneir’s testimony would vary from his pre-trial testimony; and (4) that the State had not disclosed the changes in Schneir’s testimony to defense counsel. Defense counsel also indicated the possibility of a Brady violation.

. Under Florida Rule of Criminal Procedure 3.220(b), the prosecutor has an obligation to provide discovery. Rule 3.220(j) imposes a continuing duty to disclose. These rules of criminal procedure provide in pertinent part:
(b) Prosecutor’s Discovery Obligation.
(1) Within 15 days after service of the Notice of Discovery, the prosecutor shall serve a written Discovery Exhibit which shall disclose to the defendant and permit the defendant to inspect, copy, test, and photograph the following information and material within the state’s possession and control: (A) a list of the names and addresses of all persons known to the prosecutor to have information that may be relevant to any offense charged or any defense thereto....
[[Image here]]
(B) The statement of any person whose name is furnished in compliance with the preceding subdivision. The term "statement” as used herein includes a written statement made by the person and signed or otherwise adopted or approved by the person and also includes any statement of any kind or manner made by the person and written or recorded or summarized in any writing or recording.
[[Image here]]
(j) Continuing Duty to Disclose. If, subsequent to compliance with the rules, a party discovers additional witnesses or material that the party would have been under a duty to disclose or produce at the time of the previous compliance, the party shall promptly disclose or produce the witnesses or material in the same manner as required under these rules for initial discovery.